For the reasons given by me in my opinion, In re Nicholson, the Court is of opinion that the exemption act of 11 October, 1862, applies as well to the conscription act of April, 1862, as to the conscription act of September, 1862, and the reasoning in Nicholson's case is now referred to as the ground of the decision of the Court on that point.*
In regard to the proper construction of the exemption act, in (68) its application to the conscription act of September, 1862, the Court is not called on to express an opinion, as there is no case before it which involves the question. *Page 28 
In regard to the proper construction of the exemption act in its application to the conscription act of April, 1862, the Court is of opinion that no person is embraced by its provisions so as to be entitled to exemption as a shoemaker, tanner, etc., who was at the date of its passage in the army as a soldier; that is, who had, prior to the passage (69) of the act, been placed in the military service of the Confederate States in the field. But that all "shoemakers, tanners," etc., under the age of 35 years who had not been, prior to the passage of the act, "placed in the military service of the Confederate States in the field," are embraced by its provisions, and are entitled to exemption, whether the fact of the party's not having been placed in military service in the field be owing to his not having arrived at the age of 18 years, or to his not being in the State, or to his not having been enrolled, by an (70) oversight or neglect of duty on the part of the enrolling officer, without default on the part of the party himself (which is one of *Page 29 
the cases before us), or, if enrolled, that he was not ordered into service by similar laches of the officer (which is another case before us), or to the fact that when enrolled the party was detailed to work as a shoemaker, or blacksmith, or wagonmaker, in the employment of a Government contractor, the person so detailed receiving no bounty, or pay, or rations, or clothing, as a soldier, but receiving only his (71) accustomed wages as a journeyman tradesman, of which kind is the case now under consideration, and several other cases before us, or whether they had been allowed to remain at home "as a reserve," receiving no pay as soldiers, under the provision of the sixth section of the conscription act of April. In other words, we draw the dividing line between those who had become soldiers and those who had not left the walksof private life, and were actually employed in their respective trades at the date of the passage of the exemption act. *Page 30 
The task of making an application of the exemption act to a conscription act, which was passed six months before, and had, in a great measure, been carried into effect (as I say in Nicholson's case) is a very difficult one. It is hard to make the one fit the other. The Court has been aided by very full and able arguments at the bar, and after weighing the suggestions offered pro and con, and taking into consideration the act of 9 October, 1862 (two days before the exemption act), which authorizes the President to detail from the army persons skilled as shoemakers (not exceeding two thousand), to make shoes for the soldiers, to which our attention was for the first time called by Mr. Bragg, and of which (72) neither member of the Court was before apprised, we have come to the conclusion stated above.
On the one hand, a construction confining the operation of the exemption act to the few persons who may have arrived at the age of 18 years *Page 31 
after the passage of the conscription act, and the few exceptionable cases where persons under 35 years of age had by the omissions of the Confederate officers not been enrolled, would certainly be restricting it too much; on the other, to extend its operation to all shoemakers, tanners etc., who were in the army would seem to carry it too far, and the act referred to (9 October), taking men out of the army, by detail, to make shoes for soldiers (restricting the number to two thousand), is inconsistent with the fact that two days thereafter it was the intention to take "all shoemakers, tanners," etc., from the army and send them home to work at their trades. So that broad construction is excluded. The same act furnishes proof that the members of Congress were aware of the fact that the number of artisans working at their respective occupations was not enough to supply the necessities of the public. From this we arrive at the conclusion, without going into a particular examinations of the words used, that all soldiers were to continue in service, and all who were at home, actually employed at their trades, should remain there, and be exempted as long as they should continue to work at their trades at prices not exceeding 75 percent. On the cost of production.
This construction varies in some measure from that given by me to the act in the opinion delivered In re Nicholson ; but the difference does not affect any case now before us; the distinction being that in my opinion, then, soldiers were embraced by the exemption act, but those who fail to make their election, and afterwards received pay, rations, clothing, etc., were to be considered as having waived there right to exemption; whereas in the opinion of the Court, in which I fully concur, soldiers or persons who had been placed in the military service inthe field were not embraced by the exemption act. Its practical (73) application to the only case of kind before us (In re Dixon) result in same way. He was under 35 ; was in the army as a conscript when the exemption act passed ; had received the bounty, pay, etc., of a soldier afterwards, up to November 1862, and was not entitled to exemption: where on the ground that the exemption act did not embrace his case, or, if it did, that he had waived the right, makes no difference, as in either view he has to be remanded.
* Note — IN RE NICHOLSON.